JOSH JACKSON v. THE STATE.

No. 20617. Delivered November 29, 1939.

The opinion states the case.

*A. E. Shepherd,* of Marshall, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

Appellant was convicted for assault with intent to murder; penalty assessed at confinement in the penitentiary for two years.

The only question presented is the sufficiency of the evidence to support the conviction.

The actors in this drama were colored people who lived in a densely populated area of Harrison County. G. B. Attaway, the alleged injured party, was the stepfather of the appellant's wife. There appears to have been a feud in the family which culminated in the shooting upon which the prosecution is based.

The issues in the case are sharply drawn. As might be expected, circumstanced as the incidents were with partial witnesses for each side, the appellant had a perfect self-defense case, while, from the State's viewpoint, he had none. No bills of exception appear in the record, and no brief has been filed in behalf of the appellant. If the evidence of the State's witnesses, considered alone, should be sufficient to sustain the conviction for assault to murder, the case must be affirmed.

G. B. Attaway had gone to the city of Marshall in a wagon with a load of wood. Upon returning about three o'clock in the afternoon, he met his wife on the road who brought him a .30-30 rifle loaded with about six cartridges. The only explanation appearing for her act was that she had heard that he was going to be killed. She detailed how she took the gun, made her escape from her home through circuitous roadways to the public highway and waited for the return of her husband. It is not in evidence whether or not her daughter, Ethel Jackson, and her husband, Josh Jackson, knew what she had done. In due time, her husband returned and she joined him in his wagon. The two were perched on the front part of the wagon, using a board or plank for a seat. In order to reach their home, they were compelled to pass through a gate and some ten or fifteen feet of the Josh Jackson cottage. Just before reaching the Jackson home, they met two of the neighbors who became important witnesses for the appellant in the case. The facts so far are without dispute. Henceforth, the events took place so rapidly

that it is quite natural that friends of each side might place a different interpretation on the things which occurred. According to the defense, Attaway and his wife approached the house while the appellant's wife was attending to her washing in the yard. Attaway's wife took the reins from his hands as he raised his rifle and leveled it on the appellant's wife. It is not in dispute here that the appellant's wife grabbed a stick or iron and struck at Attaway, breaking a finger on his left hand. At the same time she fell under the wagon and the rear wheel passed over her body. Some little time was required for these things to take place. The appellant and his witnesses claimed that she was actually fired upon by Attaway and the gun again leveled on her when appellant appeared on the porch with his shotgun loaded with bird shot and fired at Attaway, his claimed purpose being to shoot Attaway's hands to prevent him from killing his wife. The appellant detailed his service in the Army and claimed to be a good shot, able to place his load wherever desired, and maintained that he at no time attempted to kill Attaway but only to wound him so as to prevent him from being able to accomplish his apparent purpose to take the life of the appellant's wife.

The State's witnesses detailed transactions quite as extremely in favor of the prosecution. Attaway and his wife, being under the impression that he was going to be killed, placed his rifle on the bottom of the wagon bed with the muzzle of the gun pointing to the front. As they approached the appellant's house, they saw Ethel in the yard picking up sticks. She arose with a stick or iron in her hand and struck at her stepfather, breaking his finger, and at the same instant, a shot from the appellant's gun shattered Attaway's arm. The incidents are detailed in Attaway's testimony as follows:

"That shot he fired hit me and tore this hand (left hand) up. I then saw Josh Jackson. At that time he was standing on the end of the porch. At that time Josh Jackson was in 10 or 12 feet of me. When I saw him then he did have a weapon, he had a gun. He had a shot gun but I couldn't tell you whether a double barrel or not. He then shot me again. He shot me in the hand and when I got up he shot me through the right arm. The mules made a jump and he shot me beside the head and up there (indicating) and knocked out this eye, and that knocked me out of the wagon. It was my right eye he shot out. I cannot see out of that eye now; I am blind in that right eye as a result of that shot. I got up and my wife said, 'Josh, don't shoot Mr. Attaway any more.' She told me to run. I run towards the gate and it was

fastened and I opened it and Josh ran up close and shot me in there in the leg (indicating) with a pistol. The ball came out here. I went down the road and got down to the spring and my wife said, 'Look out he is going to shoot you again.' I shot back at him then. I had a gun. I had a rifle. That was the first shot I fired at Josh Jackson. Previous to that he had fired four shots at me. I went down the road and he came running on down and got over the fence and called his girl to bring him two more cartridges. He said he 'was going to kill the God damn son-of-a-bitch while he had the law on him.' I run towards the branch and he shot from beside a tree. I went down the branch and waited for my wife and got in the wagon. I run about 200 yards from Josh Jackson while he was following me. He shot at me twice while following me."

The cross-examination of the witness served to emphasize the foregoing testimony, and there is nothing in his statement to modify it favorably to the defense.

Pertinent excerpts from the testimony of Amanda Attaway are as follows:

"I met my husband and I carried him the gun; he didn't have a gun with him before then. I had the gun with me when I stopped him."

"Ethel Jackson was stooping down and got a stick, stooping this far (indicating) over, she got a stick or piece of iron and when she did that I started screaming and asking what she was fixing to do. The mules were rearing and we were trying to hold them and she crashed his hand and the gun shot. When we drove up to Josh's house Mr. Attaway was driving the wagon. I did try to help hold the mules when they started rearing. My husband did not say a word when he was hit by Ethel Jackson or shot by Josh Jackson then; if he did say anything I was hollering so I didn't hear him. When she crashed him and the gun shot he fell back in the wagon, and before he could do anything it, the gun, crashed twice. He was bleeding and I says to him, 'Take this gun, are you going to stand there and let Josh kill you?' I handed him the gun after he was shot twice. My husband started then trying to run; I jumped out of the wagon. The gate was fastened, something we don't do, because the crops were gotten out. He was trying to open the gate and the mules ran up close and I opened the gate and let him through and shut it and the mules stood out. I ran trying to get between them and Josh shot the shot gun one more time. I knew he shot the shot gun four times. Before he got to the gate there was a pistol shot. I don't know who shot that pistol.

"The first time I saw Josh when we drove up in front of Josh's house was just the minute I started to screaming at Ethel not to hit him; Josh walked out with his gun already and he walked out and said, 'Hold up there.' That was my first seeing him when he walked out on the porch; he wasn't on the porch when we first drove up. When I commenced screaming at Ethel he walked out and then he said, 'Hold up there' and he shot him. After he shot three times he said, 'I am going to kill this God damn black son-of-a-bitch while I got the law on my side'."

Regardless of the conflict in the testimony, the jury was confronted with the fact that Attaway emerged from the encounter with the following wounds as described by Dr. A. J. Phillips, the county physician:

"He had numerous bird shot wounds. They were bird shot; I picked two or three out of the skin when not penetrated too deep; his left hand, left index fore finger, shot all to pieces and left arm. He had shots scattered all over him; his right eye was penetrated and that produced blindness in his right eye. He was shot in the hand and finger torn up so bad (it) would be impossible to say whether anything hit it besides bird shot, but numerous shot in it too. I thought I would have to take it off a while. I examined his leg; he had one or two places on his left thigh, the lateral aspect, the middle portion of the left thigh, made with something larger than a bird shot, but was a gun shot wound of some kind, possibly could have been a large size buck shot or .32 caliber pistol bullet."

The doctor further testified that the wounds inflicted might, under some conditions, have produced death if not properly cared for; and furthermore, that if the wounds had been inflicted at a vital spot death could have resulted; that if the penetrations had gone between the ribs and into the heart this would have been the case.

The jury also had before them the fact that neither the appellant nor his wife had any wounds upon them which had been inflicted by Attaway or his wife. Under a proper charge, the jury found the appellant guilty of assault to murder and assessed his punishment as above stated.

From the testimony quoted, it is perfectly clear that the jury had a right to do so.

There being no other matter before this court for consideration, the judgment is affirmed.